IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENJAMIN MANN and<br>MCLLOYD JENSEN,<br><br>　　　　Plaintiffs,<br><br>　　　v.<br><br>DELPHOS MMJ L.P.,<br><br>　　　　Defendant | Case No. _____<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

Now come the Plaintiffs, by and through their respective legal counsel, to allege the following in support of this Complaint.

### *The Parties and the Nature of this Dispute.*

1. Plaintiff Benjamin Mann ("**Mr. Mann**") is an adult individual who resides at 7 Hillandale Road, Westport, Connecticut.

2. Plaintiff McLloyd Jensen ("**Mr. Jensen**") is an adult individual who resides at 15090 South Honor Drive, Bluffdale, Utah.

3. Defendant Delphos MMJ L.P. ("**Delphos**" or "**Defendant Delphos**") is a Delaware limited partnership with a principal place of business at 1270 Avenue of the Americas, 7th Floor, New York, New York.

4. This dispute arises from Delphos' breach of its obligation to make Continuing Commission Payments of Existing Commissions to the Plaintiffs under their respective Employment Agreements. [1]

---

[1] True and correct copies of the Plaintiffs' Employment Agreements are attached at **Exhibit A** and **Exhibit B**, respectively.

1

***This Court's Jurisdiction is Sound and Venue in this Court is Proper.***

5. Diversity jurisdiction lies in this Court if (**a**) there is diversity of citizenship between the Plaintiffs and Delphos, and (**b**) the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

6. Mr. Mann is domiciled in and is a citizen of Connecticut.

7. Mr. Jensen is domiciled in and is a citizen of Utah.

8. Conversely, Defendant Delphos is a Delaware limited partnership.

9. For diversity jurisdiction purposes, the citizenship of a limited partnership is determined by the citizenship of its general and limited partners. Carden v. Arkoma Assocs., 494 U.S. 185, 195-196 (1990).

10. According to FINRA registration records, the partners of Defendant Delphos are two Delaware limited liability companies – Delphos MMJ 1, LLC and Delphos MMJ 2, LLC.[2]

11. For diversity jurisdiction purposes, the citizenship of a limited liability company is determined by the citizenship of its members. Bayerische Landesbank, New York Branch v. Alladin Capital Management LLC, 692 F.3d 42, 49 (2d Cir. 2012) (citations omitted).

12. According to available documentation, an entity known as "Delphos Holdings Limited" owns "100%" of both Delphos MMJ 1, LLC and Delphos MMJ 2, LLC.[3]

13. On or about August 13, 2021, Delphos Holdings Limited was organized in Guernsey as a "non-cellular limited company" pursuant to a "Memorandum of Incorporation."[4]

---

[2] https://brokercheck.finra.org/firm/summary/137389delphos
[3] **Exhibit C**, "APQ global limited Half Year Report for the six months ended 30 June 2024" at 25
[4] A true and correct copy of the Memorandum of Incorporation is attached to this Complaint at **Exhibit D**.

14. Under Guernsey law, a "non-cellular limited company" is a "legal person, separate from its members, which comes into existence upon incorporation and continues until it is removed from the Register of Companies." The Companies (Guernsey) Law, 2008 at Pt. 1, § 1.

15. As reflected in the Memorandum of Incorporation, the "liability of each member of the company is limited to the amount, if any, unpaid on the shares held by him."[5]

16. According to the Memorandum of Incorporation, APQ Global Limited ("**APQ**") is the sole shareholder of Delphos Holdings Limited and does not owe any unpaid amount on shares of Delphos Holdings Limited.[6]

17. Thus, APQ – Delphos Holdings Limited's sole owner – has no liability for Delphos' obligations or operations.[7]

18. Accordingly, Delphos Holdings Limited is the functional equivalent of a corporation under United States law. The Companies (Guernsey) Law, 2008 at Pt. 1, § 1, accord Exhibit D, Van Noland v. Pelletier, No. CIV S-09-2035 MCE DAD PS, 2010 WL 11698197 at *7-8 (E.D. Cal. Feb. 24, 2010).

19. Upon information and belief, Delphos Holdings Limited's principal place of business is also in Guernsey.

20. Having been organized in and having its operations in Guernsey, Delphos Holdings Limited is a citizen of Guernsey for federal diversity jurisdiction purposes. 28 U.S.C. § 1332(c)(1); see also Van Noland supra.

21. In turn, Delphos MMJ 1, LLC and Delphos MMJ 2, LLC, the owners of Defendant Delphos, are also citizens of Guernsey for federal diversity jurisdiction purposes because the

---

[5] Exh. D
[6] Id.
[7] Id.

citizenship of each LLC is determined by the citizenship of the LLC's owner – Delphos Holdings Limited.  Bayerische Landesbank, New York Branch, 692 F.3d at 49.

22. And, in turn, Defendant Delphos is also a citizen of Guernsey for federal diversity jurisdiction purposes because its citizenship is also determined by the citizenship of its owners – Delphos MMJ 1, LLC and Delphos MMJ 2, LLC.  Carden, 494 U.S. at 195-196.

23. Therefore, there is complete diversity between the Plaintiffs (citizens of Utah and Connecticut, respectively) and Defendant Delphos (a citizen of Guernsey).

24. Further, as detailed below, more than $75,000 is in dispute.

25. Accordingly, this Court has diversity jurisdiction over this case.  28 U.S.C. § 1332.

26. Venue in this Court is also proper.

27. As noted above, this dispute arose under the respective Employment Agreement that each Plaintiff signed with Delphos.

28. In relevant part, Section 7 of each of the Employment Agreements provides:

> The exclusive forum for any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be the federal or state courts situated in the State of New York and each of the parties consents to the exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.[8]

29. Accordingly, venue in this Court is proper.  E.g. National Union Fire Insurance Company of Pittsburgh, PA v. Wynn Las Vegas, LLC, 509 F.Supp.3d 38, 47-48 (S.D.N.Y. 2020); see also Goldman, Sachs & Co. v. Golden Empire Schools Financing Authority, 764 F.3d 210 (2d Cir. 2014) (holding a forum selection clause requiring disputes to be litigated in court overrides FINRA rules requiring and governing arbitration).

---

[8] E.g. Exh. A at § 7

***The Origin of the Relationship Between the Plaintiffs and Delphos.***

30. For several years, the Plaintiffs were the managing members of MMJ Partners LLC ("**MMJ**").

31. MMJ was in the business of introducing investors to investment funds and would be paid commissions by those funds on investments placed by investors introduced to the funds by MMJ.

32. In early 2023, Defendant Delphos acquired MMJ.

33. With respect to existing commission streams, the fundamental terms of the deal between the Plaintiffs and Delphos were simple and logical: for all commission streams the Plaintiffs had generated through MMJ from legacy investment fund clients ("**Legacy Funds**") prior to Delphos' acquisition of MMJ, the Plaintiffs would receive 100% of those commissions (net of any origination fees) for as long as the investors the Plaintiffs introduced to the Legacy Funds remained invested in those Funds. Otherwise, the Plaintiffs and Delphos would split commissions for new deals generated by the Plaintiffs after the acquisition closed. For ease of reference, the commissions generated from the Legacy Funds are referred to in this Complaint as "**Existing Commissions**".

34. Absent the agreement reached on the Existing Commissions, neither Plaintiff would have approved or cooperated with Delphos' acquisition of MMJ.

***The Employment Agreements Memorialize Delphos' Obligation to Make Continuing Commission Payments of Existing Commissions to the Plaintiffs "For as Long as Certain Investors Are Invested in Certain Investment Funds".***

35. In acquiring MMJ, Delphos offered each of the Plaintiffs employment and asked each of them to sign his respective Employment Agreement.

36. Under the Employment Agreements, each Plaintiff was given a two (2) year term of employment with Delphos.

37. Critically, however, Section 4.4 of each of the Employment Agreements specifically contemplates Delphos having the right to terminate "without Cause."[9]

38. Thus, neither of the Plaintiffs was guaranteed any term of employment by Delphos.

39. Seeing as that was so, neither Plaintiff was willing to sign his Employment Agreement with Delphos unless he was certain that, if the employment relationship ever ended, the Employment Agreement clearly required Delphos to continue paying Existing Commissions so long as the investors the Plaintiffs introduced to the Legacy Funds remained invested in those Funds.

40. Otherwise, Delphos would have been able to terminate the Plaintiffs at any time without "Cause" and retain their Existing Commissions on the Legacy Funds – despite having no role whatsoever in originating the Existing Commissions and despite giving no consideration for the Existing Commissions as part of its acquisition of MMJ.

41. To address the Plaintiffs' concerns in that regard, each of their respective Employment Agreements contains several provisions requiring Delphos to continue paying each of the Plaintiffs his share of the Existing Commissions so long as the investors the Plaintiffs introduced to the Legacy Funds remain invested in those Funds.

42. To begin with, Section 3.3 of each of the Employment Agreements provides in relevant part:

> The Employee shall be eligible to receive compensation per schedule 1 of Existing Commission *earnt* prior to the Partnership Interest Purchase detailed in Schedule 1.[10]

---

[9] E.g. Exh. A at § 4.4
[10] Id. at § 3.3 (emphasis added)

43.     Turning to Schedule 1 (entitled "**Term Sheet**"), next to the line that reads "Existing Commission", the following explanation is provided:

> The Employees will each receive 50% of Net Delphos MMJ Revenue for subscriptions arranged directly by either of the Employees into the Legacy Funds' Investments listed below, before 12/31/2022.[11]

44.     In the Term Sheet, the phrase "Net Delphos MMJ Revenue" is defined as "Net Commission received by Delphos MMJ as cash and paid to the Delphos MMJ bank accounts."[12]

45.     Thus, consistent with the parties' understanding from the outset, the Employment Agreements make it clear that the Plaintiffs are collectively entitled to receive every penny of Existing Commissions (net of any origination fees).

46.     Consistent with the parties' understanding from the outset, Section 4.3 and Section 4.5 of each of the Employment Agreements make it clear Delphos is required to continue paying each of the Plaintiffs his share of the Existing Commissions so long as the investors the Plaintiffs introduced to the Legacy Funds remain invested in those Funds:

> **_For the avoidance of doubt_**, the Company's obligation to pay Employee for Accrued Commissions includes any continuing payment obligations included in such Accrued Commissions, such as, by way of illustration and not limitation, **_the Company's obligation to make continuing payments to Employee for as long as certain investors are invested in certain investment funds_** (such payments, "**_Continuing Commission Payments_**").[13]
>
> **_Notwithstanding anything to the contrary_**, if this Agreement or Employee's employment with the Company is terminated for any reason, all payments for Accrued Commissions, including any Continuing Commission Payment, owing to Employee shall be made to employee in accordance with the terms of this agreement unless prohibited by law or applicable regulations. In order to permit Employee to continue receiving such payments, Employee may either maintain Employee's registration with the Company or become associated with another registered broker dealer, in which case all payments for Accrued Commissions, including any Continuing Commission Payments, shall be remitted to another broker dealer designated by Employee. **_Notwithstanding anything to the contrary_**,

---

[11] E.g. Exh. A at Term Sheet.  In the Term Sheet, the term "Employees" refers to the Plaintiffs.
[12] E.g. id.
[13] E.g. Exh. A at § 4.3 (emphasis added, except for the emphasis on "Continuing Commission Payments")

the Company will pay Employee all accrued Commissions and Continuing Commission Payments whether or not Employee is employed by the Company on the date any such payment becomes due.[14]

47.     In turn, the term "Accrued Commissions" is defined under each of the Employment Agreements as "commissions accrued through the date of termination. . .in accordance with Section 3 of this Agreement. . .".[15]

48.     As noted above, Section 3.3 defines the Existing Commissions as having already been "earnt" by the Plaintiffs by the time the Employment Agreements were signed.

49.     Thus, by definition, the Existing Commissions also "accrued" prior to the date on which the Employment Agreements terminated because the Existing Commissions had already been "earnt" by the time the Employment Agreements were even signed.

50.     Consistent with the parties' understanding from the outset, Sections 3.3, 4.3, and 4.5 of each of the Employment Agreements, and the Term Sheets, Section 9 in each of the Employment Agreements further specifies that Sections 3 and 4 "will continue in full force and effect" after termination.[16]

51.     In short, the Employment Agreements are crystal-clear: Delphos is contractually obligated to make "Continuing Commission Payments" to the Plaintiffs of all "Existing Commissions" for "as long as" investors introduced by the Plaintiffs to the Legacy Funds remain invested in those Funds – irrespective of whether the Plaintiffs are "employed by the Company on the date any such" Existing Commission "payment becomes due."

---

[14] Exh. A at § 4.5 (emphasis added)
[15] E.g. id. at § 4.3
[16] Id. at § 9

***Mr. Mann Resigns from Delphos. And Delphos Continues to Make Continuing Commission Payments of Existing Commissions – Only to Then Cease Doing So Without Explanation or Justification.***

52. On August 13, 2024, Mr. Mann resigned from Delphos.

53. At no time prior to Mr. Mann's resignation did Delphos discipline or threaten to terminate him – whether for "Cause" or otherwise.

54. On September 3, 2024, Delphos' counsel sent Mr. Mann a letter explaining in relevant part:

> You also claim that the Company did not pay you commissions on a timely basis. You fail to specifically state which commissions you assert were not timely paid. Pursuant to the Agreement, commission payments are "to be processed within 30 days of funds being received by Delphos MMJ." The Agreement does not state that payments must be paid to you within 30 days of receipt, as you contend. In fact, the Company has always processed payments to you within the time period set forth in the Agreement and you have been fully paid all commissions that have come due to you.
>
> Because your resignation was not for Good Reason, you do not have the opportunity to receive Severance Pay contingent upon signing a release.[17]

55. Not only does the letter from Delphos' counsel allude to Delphos making Continuing Commission Payments of Existing Commissions ("that have come due"), but there is no mention whatsoever in the letter that Delphos felt it was entitled to stop making Continuing Commission Payments of Existing Commissions – even though Delphos' counsel made a point of notifying Mr. Mann he would not receive Severance Pay.

56. If Delphos felt it had a legitimate basis to stop making Continuing Commission Payments of Existing Commissions to Mr. Mann, it is curious why Delphos' counsel omitted that

---

[17] **Exhibit E**. However unartfully expressed, it appears Delphos' counsel sees a distinction between "processing" payments due to Mr. Mann and "making" the payments to him. To the extent there is a distinction, it is one of semantics – not of substance.

9

from her letter given the value of the Existing Commissions dwarf the value of the Severance Pay by many multiples.

57. Indeed, on an annual basis in recent years, total Existing Commissions have been in the range of $700,000 to $1,000,000.

58. After Mr. Mann resigned, Delphos made Continuing Commission Payments to him of Existing Commissions attributable to the fourth quarter of 2024 and the first quarter of 2025.

59. During the first quarter of 2025, Mr. Mann became affiliated with a new broker-dealer – Britehorn Securities/AKM Capital Advisors LLC (CRD #36402) ("**Britehorn/AKM**").

60. To ensure Delphos kept up with its contractual obligation to make Continuing Commission Payments of Existing Commissions through "another registered broker dealer" to him, Mr. Mann repeatedly reached out to Delphos to confirm it had entered the necessary "broker-to-broker agreement" with Britehorn/AKM.[18]

61. After Mr. Mann sent repeated follow-ups, Delphos' Chief Compliance Officer, Frank Ingraham, finally responded by email on February 6, 2025:

> Hi Ben,
>
> As you are aware, although not obligated to do so, and with full reservation of its rights, Delphos MMJ elected to voluntarily continue to pay you commissions during your severance period, which concludes on February 13, 2025. Delphos MMJ is required to comply with FINRA Rule 2040, which strictly governs continuing commission payments to registered representatives no longer associated with their prior broker-dealer. Under this Rule, a retiring registered representative may continue receiving commissions only if he/she entered into a retired representative agreement in accordance with the Rule with his/her broker-dealer prior to termination. Since you did not enter into such a retired representative agreement while at Delphos MMJ (and your Employment Agreement dated Feb 20, 2023 does not comply with Rule 2040), as an unregistered person, you are not entitled to any commissions under FINRA rules and Delphos MMJ is unable to even voluntarily continue to pay you any commissions beyond the termination date of your employment severance payments. However, as a courtesy to you, if you become registered with another broker-dealer, Delphos MMJ is voluntarily willing

---

[18] See Exh. A at § 4.5

to enter into a commission sharing/payment agreement with that broker-dealer (if it is so willing), whereby Delphos MMJ would pay over to that broker-dealer a percentage (as agreed between Delphos MMJ and you) of the commissions actually received from the date of that agreement that you would have otherwise been able to receive had you stayed a registered person with Delphos MMJ.[19]

62. During a telephone conversation on May 23, 2025, Mr. Ingraham informed Mr. Mann that Delphos had no intention of making any further Continuing Commission Payments of Existing Commissions.

63. Consistent with that, since receiving the Continuing Commission Payment of Existing Commissions attributable to the first quarter of 2025, Mr. Mann has received no further payments, has seen no movement in response to his repeated demands that Delphos finalize the broker-to-broker agreement with Britehorn/AKM, and received additional confirmation from Delphos' counsel that Delphos refuses to make any further Continuing Commission Payments of Existing Commissions.

### *Plaintiff Jensen Resigns from Delphos, and Delphos Refuses to Make Continuing Commission Payments of Existing Commissions to Him.*

64. On March 21, 2025, Plaintiff Mr. Jensen resigned from Delphos. Consistent with Section 4.5 of his Employment Agreement, Mr. Jensen promptly notified Delphos in writing that he would continue to be entitled to Continuing Commission Payments of Existing Commissions following termination.[20] In the same notice, Mr. Jensen designated Umergence LLC (CRD 284368) as the broker-dealer to receive those Continuing Commission Payments and supplied complete remittance and wire instructions so that Delphos could process the Continuing Commission Payments without delay.

---

[19] A true and correct copy of Mr. Ingraham's email is attached to this Complaint at **Exhibit F**. It is unclear why Mr. Ingraham refers to "your employment severance payments" in the email. Consistent with the letter from Delphos' counsel dated September 3, 2024, Delphos did not make any severance payments to Mr. Mann.
[20] A true and correct copy of Mr. Jensen's email is attached to this Complaint at **Exhibit G**.

65. In the weeks that followed, Mr. Jensen repeatedly requested that Delphos finalize an arrangement with Umergence and timely remit his Existing Commissions. On May 5, 2025, Delphos sent Mr. Jensen a proposed "Commission Payment Agreement"[21] that would (if signed) result in the termination of his Continuing Commission Payments of Existing Commissions within two years:

> "The term of this Agreement (the 'Term') shall continue until terminated on its second anniversary unless terminated earlier (i) immediately upon one Party ceasing to be an SEC-registered broker-dealer or FINRA member or upon the payments hereunder being prohibited by Applicable Law, or (ii) immediately upon Jensen ceasing to be a registered person of Umergence. **Upon termination, all obligations of Delphos MMJ to provide payments hereunder and under the Jensen - Delphos MMJ Agreement shall automatically cease.**"[22]

66. Delphos' proposal was commercially unreasonable and inconsistent with the parties' original intention. Mr. Jensen originated and cultivated relationships with the Legacy Funds years before he was affiliated with Delphos. The Existing Commission streams arise from those pre-acquisition relationships and introductions. Delphos has no legitimate basis on which to demand that Mr. Jensen relinquish his right to Continuing Commission Payments of Existing Commissions or to expect he will ever do so, let alone after only two years.

67. On June 19, 2025, Mr. Jensen sent an email to Delphos reminding it that Existing Commissions were due pursuant to his Employment Agreement and again inquiring whether Delphos could identify any contractual justification for withholding payment.[23]

68. On June 26, 2025, Mr. Jensen served a formal Notice of Breach, advising Delphos that it had failed to remit Existing Commissions within the timeframe required under his Employment Agreement and demanding that Delphos cure its payment default immediately.[24]

---

[21] **Exhibit H**
[22] Id. at § 3 (emphasis added)
[23] A true and correct copy of Mr. Jensen's email is attached to this Complaint at **Exhibit I**.
[24] A true and correct copy of Mr. Jensen's email is attached to this Complaint at **Exhibit J**.

69. When Delphos again failed to make payment or provide any substantive justification for failing to do so, Mr. Jensen sent another follow-up on July 1, 2025 again requesting immediate payment or a written commitment by July 7, 2025. Delphos responded the next day only to say it was "reviewing" the matter internally. Since that exchange, Delphos has not remitted any Continuing Commission Payments of Existing Commissions to Mr. Jensen.[25]

70. To make matters worse, Delphos refuses to pay Mr. Jensen the Existing Commissions attributable to and due to him for the first quarter of 2025 – a time period during which he remained affiliated with Delphos.

***Delphos' Breaches of the Plaintiffs' Employment Agreements Stem from Its Financial Troubles, Not From Any Legitimate Legal Position.***

71. Upon information and belief, during all times relevant to this Complaint, Delphos has continued to receive Existing Commissions from the Legacy Funds and has unjustly retained those Existing Commissions.

72. Delphos' refusal to make further Continuing Commission Payments of Existing Commissions due to the Plaintiffs stems from Delphos' own financial difficulties – not from any term or condition in the Employment Agreements or from any legitimate legal position.

73. Delphos is part of a larger corporate pyramid, with APQ (referenced above) sitting at the apex.

74. In March of this year, under pressure from the holders of its convertible unsecured loan stock ("**CULS**"), APQ: (**a**) delisted its shares from the London Stock Exchange, (**b**) agreed not to subordinate any of the CULS redemption obligations to any other obligation, and (**c**) agreed

---

[25] A true and correct copy of Mr. Jensen's email is attached to this Complaint at **Exhibit K**.

to pay all cash reserves exceeding certain thresholds (initially, $5 million and then $3 million) to CULS holders until the CULS redemption obligations are satisfied in full.[26]

75. According to published reports, APQ is "facing challenges in satisfying the CULS redemption obligation" and thus deferred the obligation to December 31, 2025.[27]

76. In exchange for the deferral, APQ will pay CULS holders an increased rate of interest during the deferral period – further depleting APQ's liquidity.[28]

77. The financial pressures in the APQ/Delphos orbit are not only cascading from the top down, but also bubbling from the bottom up.

78. For example, according to APQ's "Half Year Report for the six months ending on June 30, 2024", APQ was continuing to make "further capital contributions" to Delphos.[29]

79. Delphos is supposed to be generating revenue that flows up to APQ at the apex of the pyramid, not the other way around.

80. Now that APQ's ability to use cash reserves is limited due to the arrangement reached with the CULS holders, the Plaintiffs do not believe APQ has the liquidity to make additional contributions to Delphos.

81. Rather, upon information and belief, Delphos is refusing to make Continuing Commission Payments on Existing Commissions as part of a broader effort to not only generate liquidity to sustain its operations – but to generate liquidity to supplement APQ's decreased cash flows.

---

[26] https://www.investing.com/news/company-news/apq-global-to-delist-shares-and-modify-culs-terms-93CH-3957642
[27] https://marketshareai.uk/news/lse/apq/6883z
[28] Id.
[29] Exh. A at 2

## COUNT I

## Breach of Contract

82. The allegations above are incorporated into this Count by reference as if fully set forth in the Count.

83. Each of the Employment Agreements is "governed by" and must be "construed in accordance with the laws of the State of New York, without regard to [the] conflicts of laws principles thereof."[30]

84. Under New York law, the elements of breach of contract are: (1) the existence of a contract; (2) adequate performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages. Piuggi v. Good for You Productions LLC, 739 F.Supp.3d 143, 167 (S.D.N.Y. 2024).

85. Each of the Plaintiffs entered into an Employment Agreement with Delphos.

86. Each of the Employment Agreements constitutes a binding contract.

87. At no time did Delphos discipline or threaten to fire either of the Plaintiffs – whether for "Cause" or otherwise.

88. Accordingly, each of the Plaintiffs performed under his respective Employment Agreement.

89. By refusing to make Continuing Commission Payments of Existing Commissions under the Employment Agreements, Delphos is in breach of each of the Employment Agreements.

90. Each of the Plaintiffs has sustained significant financial damage and will continue to sustain significant financial damage as a result of Delphos' breach of the Employment Agreements.

---

[30] E.g. Exh. A at § 7

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in each of their favor and against Delphos in an amount to exceed $75,000 and award all other relief to the Plaintiffs that the Court deems necessary or appropriate under the circumstances including, but not limited to, prejudgment interest, attorney fees, and injunctive relief requiring Delphos to enter into any agreements or contracts necessary to effectuate the payment of Existing Commissions to the Plaintiffs.

## COUNT II

### Unjust Enrichment

91. The allegations above are incorporated into this Count by reference as if fully set forth in the Count.

92. To prevail on a claim for unjust enrichment, "a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." See Emergency Physician Services of New York v. UnitedHealth Group, Inc., 749 F.Supp.3d 456, 472 (S.D.N.Y. 2024) (citation omitted).

93. By retaining the Existing Commissions, Delphos is benefiting financially.

94. By retaining the Existing Commissions, Delphos is benefiting at the Plaintiffs' expense.

95. Delphos had no role in originating the Existing Commissions and gave no consideration for the Existing Commissions.

96. Absent the agreement reached on the Existing Commissions, neither Plaintiff would have approved Delphos' acquisition of MMJ.

97. Accordingly, equity and good conscience require that Delphos pay over all Existing Commissions to the Plaintiffs.

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in each of their favor and against Delphos in an amount to exceed $75,000 and award all other relief to the Plaintiffs that the Court deems necessary or appropriate under the circumstances including, but not limited to, prejudgment interest, attorney fees, and injunctive relief requiring Delphos to enter into any agreements or contracts necessary to effectuate the payment of Existing Commissions to the Plaintiffs.

## COUNT III

### Promissory Estoppel

98.  The allegations above are incorporated into this Count by reference as if fully set forth in the Count.

99.  "To state a cause of action for promissory estoppel, the Plaintiffs must allege a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." See Frio Energy Partners, LLC v. Finance Technology Leverage, LLC, 680 F.Supp.3d 322, 342 (S.D.N.Y. 2023) (citations and internal quotation marks omitted).

100. Delphos clearly and unambiguously promised that, if the Plaintiffs signed off on and cooperated with Delphos' acquisition of MMJ, they would continue to receive the Existing Commissions so long as investors introduced by the Plaintiffs to the Legacy Funds remained invested in those Funds.

101. The Plaintiffs reasonably and foreseeably relied on that promise.

102. Indeed, it is only logical the Plaintiffs continue to receive the Existing Commissions so long as the investors they introduced to the Legacy Funds remain invested in those Funds

because Delphos had no role in originating the Existing Commissions and gave no consideration for the Existing Commissions.

103. The Plaintiffs relied on Delphos' promise that it would continue paying the Existing Commissions to the Plaintiffs so long as the investors they introduced to the Legacy Funds remained invested in those Funds.

104. Had the Plaintiffs not relied on Delphos' promise, they would still control MMJ and would still be receiving the Existing Commissions through MMJ just as they had before Delphos acquired MMJ.

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in each of their favor and against Delphos in an amount to exceed $75,000 and award all other relief to the Plaintiffs that the Court deems necessary or appropriate under the circumstances including, but not limited to, prejudgment interest, attorney fees, and injunctive relief requiring Delphos to enter into any agreements or contracts necessary to effectuate the payment of Existing Commissions to the Plaintiffs.

## COUNT IV

### Declaratory Judgment

105. The allegations above are incorporated into this Count by reference as if fully set forth in the Count.

106. Under 28 USC § 2201, a declaratory judgment is appropriate where the facts alleged show that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy to warrant declaratory relief.

107. As detailed above, the Plaintiffs are entitled to Continuing Commission Payments of Existing Commissions from Delphos so long as the investors they introduced to the Legacy Funds remain invested in those Funds.

108. However, Delphos refuses to make Continuing Commission Payments of Existing Commissions that are already past due and has confirmed it does not intend to make Continuing Commission Payments of Existing Commissions in the future.

109. Accordingly, there is a substantial controversy between the Plaintiffs and the Defendant that is immediate, ongoing, and prospective in nature and that thus warrants declaratory relief.

110. To avoid having to come before the Court each time Delphos refuses to make a Continuing Commission Payment of Existing Commissions in the future, the Plaintiffs are seeking a declaratory judgment that Delphos shall have thirty (30) days from receipt of Existing Commissions to pay the Existing Commissions to the Plaintiffs.

WHEREFORE, the Plaintiffs respectfully request this Court enter a judgment in their favor and against Delphos requiring Delphos to pay any Existing Commissions received to the Plaintiffs within thirty (30) days of receipt.

Dated: January 2, 2026

Respectfully Submitted,

**KATTEN MUCHIN ROSENMAN LLP**

*/s/: Susan Light,*
Susan Light, Esquire
susan.light@katten.com
50 Rockefeller Plaza
NY, NY 10020
(212) 940-8599
Attorney for Plaintiff McLloyd K. Jensen

*/s/: Michael Lohnes,*
Michael Lohnes, Esquire
michael.lohnes@katten.com
525 West Monroe St.
Chicago, IL 60661
(312) 902-5341
Attorney for Plaintiff McLloyd K. Jensen
*Pro Hac Vice* Application Forthcoming

**SAXTON & STUMP**

*/s/: Jason T. Confair,*
Jason T. Confair, Esquire
Attorney I.D. No. 206729
jconfair@saxtonstump.com
280 Granite Run Drive
Suite 300
Lancaster, PA 17602
(717) 556-1033
Attorney for Plaintiff Benjamin Mann
*Pro Hac Vice* Application Forthcoming